The motion must be overruled.

C. W. Baker, for plaintiff.

Maxwell & Ramsey, contra.

---

(Superior Court of Cincinnati.)
Special Term, 1901.

---

(Hamilton County, Court of. Common Pleas.)
THE STATE OF OHIO, ex rel. J. M. SHEETS, At'ty Gen'l. v. WILLIAM N. HOBART, et al.

---

(1.) Every boxing match or sparring exhibition for a prize fight is a crime under the laws of Ohio.

(2.) No public gymnasium or athletic club, whether it has been organized bona fide or is a sham, can exhibit a boxing match or sparring contest for a prize under any circumstances whatever.

(3.) That the contestants fight with gloves instead of bare fists, and for a limited number of rounds instead of "to a finish," is of no importance, nor do these circumstances mitigate the brutality of the contest or lessen the danger of injury to the combatants to any material extent.

(4.) All such affairs when held in public are common nuisances. They attract among others, the idle and vicious elements in society, and persons whose occupations are for the most part criminal; whose lives and conduct degrade a community. They are brutal exhibitions of physical force trained to a high degree of power and endurance; they are gladiatorial in their nature, and are under the ban of civilization. They set false standards of manly virtues and are a disgrace to the community in which they are held. They affect the fair name and honor of the state and of the place in which they are held. They make a man's place of habitation less desirable to live in, and are humiliating to him individually and as a citizen. They are degrading, and are injurious to the moral tone of the community, and tend to make it and private standards lower. Their effects are demoralizing and pernicious to the good order and well being of society. The facts in this particular case show a common public nuisance of the first magnitude.

(5.) Such contests with their attendant evils affect a man's comfort and welfare, and may even endanger his safety. They interrupt and prevent the calm enjoyment of life and the peaceful pursuit of happiness which are among every man's inalienable rights, guaranteed him by the constitution, and to secure which, with other things, governments are established among men.

(6.) A court of equity takes cognizance of these things, and when a threatened act, although a crime, is with its attendant circumstances also a public nuisance, will when the apprehended injury is irreparable, and there is for it no adequate remedy at law, prevent its execution by injunction.

(7.) The State is interested in the enjoyment of life, the happiness, the health, the comfort, the safety, the morals and the well-being of its inhabitants, and its courts are open to it, on the relation of its attorney general to prevent the infringement of these rights by any public nuisance. If the law is inadequate, or gives no remedy, the courts exercising equity jurisdiction will afford relief.

(8.) It is not essential that any property rights be involved in order that a court of equity may take cognizance of a public nuisance. The enjoyment of life, the happiness, the health, the comfort, the morals, the safety and the well-being of the inhabitants of a state are of more importance to them and to it than any property or mere money interests they or it can possibly have; and the right to these has at least the same constitutional guarantees that the right of property has.

(9.) Indirectly property rights are involved in a public nuisance which lowers the moral tone of a community, gives it a bad reputation, and consequently makes it a less desirable place to live in. Property rights are directly affected when the nuisance is of such a character that extra police must be employed to prevent breaches of the peace and to

afford protection to the community from large numbers of vicious people whose presence, with other things, constitutes the nuisance. This, and the maintenance of additional courts of criminal jurisdiction, affect the pocket of every tax-payer.

(10.) A court of equity will not invent a new remedy, but will apply old and established principles to a new state of facts.

HOLLISTER, J.

The Jubilee Festival of the Associated Saenger Societies of the United States was held in Cincinnati in June, 1899. The preparations for the concerts to be given, including the construction of a suitable building, were entrusted upon the petition of four thousand members of the various societies to thirty-one citizens of Cincinnati who are here made defendants to this action. These gentlemen are well-known in the community and have high standing in the business and social world; some of them occupy leading positions in a number of local banks, and many of them own or are interested in business concerns of standing and importance well known here and elsewhere, and are for the most part, at least by repute, men of considerable financial responsibility.

It was supposed that a hall sufficiently large and strong to accomodate four thousand singers and the great audience which would be in attendance upon the concerts would cost about $35,000. When the building was under roof it became apparent that it was not safe. It was practically reconstructed, and by great efforts was completed but one day after the date advertised for the opening of the festival. So alarming were the reports of the condition of the building that notwithstanding repeated assurances by eminent authority of its safety, the attendance while large was smaller than it would otherwise have been. The expense of reconstruction and other necessarily attendant additional expenses were under the circumstances very great, and the building cost about $100,000.

The gentlemen who built the hall became thus personally liable for a large sum of money, and having given their services for the benefit of the community without expectation or desire of reward, were of opinion that the debt was in its nature public, and that they should be relieved from it.

They determined first of all that all labor claims should be, and they were, paid. This was done by twenty-two of their number paying five hundred dollars apiece for that purpose. Each of these individuals gave his note to certain banks for $2,000, and with the sum so raised all of the indebtedness incurred in constructing the building was paid. These gentlemen have paid or owe a sum which now with interest amounts to about $67,000.

Various plans were devised from time to time to raise money. Among them an appeal was made and sent generally to all persons who it was thought could or would contribute. This appeal reads:

     "This is an Appeal to You."

           Cincinnati, August 15, 1899.
Cincinnati First, Last and all the Time.

Dear Sir:

You, like ourselves, are a citizen of Cincinnati, interested in its welfare, and as such we address you. We believe that every enterprise that brings strangers to our city is a benefit, and is therefore worthy of encouragement. On account of our favorable location, great efforts have been made for several years, to bring conventions and other gatherings here, all of which have proven successful and profitable to our business interests. The greatest success in this direction was the 32nd National Encampment, G. A. R. of 1898, which brought thousands of people, and more thousands of dollars to our city. The undersigned "Executive Board of the Golden Jubilee Saengerfest" hoped to make its Golden Jubilee even a greater success if possible, and to accomplish that end, worked faithfully and constantly for two years without any compensation whatever.

From a musical standpoint the festival was one of the greatest successes Cincinnati ever scored, but owing to the enormous expense connected with this great enterprise, in addition to unforeseen accidents to the building, which largely increased the expenses, the receipts were not sufficient to meet necessary expenditures, leaving a deficit of about $70,000.00 This must be paid at once, and unless the citizens of our city come to our assistance immediately to meet this deficit, disgrace and shame will be placed on the fair name of Cincinnati. Such an experience for any committee whose patriotism alone prompts them to give their time and best efforts to such work, will not be encouraging to public enterprises of this character in the future, because it would be entirely too hazardous for any committee, and make it very difficult to secure any of our citizens for such work. In the interest of our city we do not think our citizens can afford, or will permit this.

"We, therefore, appeal to you to help us, and request you to be kind enough to mail at once a check for as liberal an amount as you can afford. Do not wait for a solicitor, because

we have none, but use enclosed stamped envelope. Any amount will be thankfully received and promptly acknowledged."

This plan was a failure. Whether the public generally did not appreciate why it should pay private debts contracted by these gentlemen, although in a semi-public enterprise, or believed that the debt was the result of mismanagement and that the burden should fall upon those who had created it, it is impossible to say. At any rate, only $1,800 was brought in by this effort.

Apparently the next plan devised was the incorporation of a company called "The Convention Hall Company", of which these parties became members, the incorporate objects of which were:

"Owning and maintaining a hall for the use of conventions and other purposes."

This was done on the 26th day of August, 1899. The thirty-one gentlemen who had been the executive board of the Jubilee Saengerfest, in consideration of all of the liabilities of their board transferred the Saengerfest Hall to this company.

In the early part of 1899 a plan was devised of giving concerts of a high grade through which, and as an inducement to attendance upon which, the hall or its value was to be disposed of or given to whomsoever should become the purchaser of the ticket for the concerts the possession of which would entitle the holder to the hall or its value, $10,000. A sample ticket offered in evidence reads:

"No. 04776

"    Concerts.

"To be given to pay the deficiency of the Jubilee Saengerfest, held in Cincinnati, Ohio, 1899. Series of concerts. (Date to be announced later.) This ticket will admit the holder to any of the entertainments of the above series. Twenty-five cents additional for reserved seats. Diagram and selection of seats at the John Church Co. Price of tickets $1.00".

"Coupon. Concerts for deficiency of the Jubilee Saengerfest. Ticket No. 04776. Retain this coupon."

And on the back:

"Guarantee. The future owner of the Saengerfest Building can get $10,000.00 in cash, if at least 35,000 Concert tickets have been sold, by transferring the title of the building to The Cincinnati Convention Hall Co."

The building was on leased ground belonging to the Cincinnati Zoological Company, to which the Convention Hall Company was pay-ing rent. The exact details of the plan by which the purchaser of the fortunate ticket was to acquire the title of the building had not been determined upon apparently, but that such person could obtain the building or $10,000 in cash as the result of chance, is admitted. The scheme was in substance a lottery, and the company was advised by its then counsel, Mr. W. W. Ramsey, that if carried out it would be against the laws of the state and of the United States.

Some progress had been made; the minutes of the company of February 8, 1900, show that one of the members "reported fully on the lottery concert scheme. Some 7214 tickets were given out, and 1272 were accounted for," and the contract for the sale of further tickets was directed to be terminated.

This scheme was abandoned, whether because 35,000 tickets had not been sold, or because it was contrary to law, does not appear.

On October, 22, 1900, it was resolved to sell the building, which was done at public auction November 15, 1900, for $5,200. The terms of sale provided among other things: "Possession to be given * * * within three months of this date * * * Time of delivery to be at the option of said company. Balance of purchase money to be paid when * * * the company notifies the purchaser that the property is ready for delivery. The purchaser obligates himself to remove property within three months from the date of such notice."

Prior to the sale one of the company introduced to another Mr. Herman J. Witte, formerly for many years a well known detective connected with the city police force, now a lawyer; a reputable man so far as the court knows or has ever heard. With him some arrangement was made, the exact nature of which does not appear, by which he was to ascertain whether or not a contest could be brought about in Cincinnati for the benefit of the gentlemen who had become indebted on account of the Saengerfest, of a nature called by the defendants a "glove contest", or "sparring exhibition," and by the state a "prize fight".

Mr. Witte went to New York. His first visit was about November 1, 1900, on which occasion he paid his own expenses. This visit was to find out specifically "whether or not Mr. Jeffries and Mr. Corbett could come here and give a sparring exhibition." His intentions were known to at least the directory of the company, if not all of the members. The giving of a boxing contest had been suggested, it is said, long prior to this time, and at vari-

ous times, to the members of this company by citizens; who they were does not appear. On the occasion of the first visit Mr. Witte saw Mr. William A. Brady of New York. About two weeks afterwards he again went there at the company's expense, and saw Mr. Brady about Mr. Jefferies coming here and sparring. Mr. Brady is a manager of theatrical companies, a promoter of amusements, was visor of Mr. James J. Corbett on the occasion formerly an actor, and was adviser or super-of his contest with Mr. Fitzsimmons at Carson City, on the 17th of March, 1807.

Mr. Jefferies is the "Champion of the World," a title he won from Mr. Fitzsimmons at Carson City; Mr. Fitzsimmons wrested that honor from Mr. Corbett, who in turn defeated the then notorious John L. Sullivan. Who held the title prior to that encounter does not appear. There is serious dispute in the case over the meaning of "Champion of the World". The defense strongly insists that it means the champion "boxer" or "sparrer", the state that it means champion "prize-fighter". It is probably not doubtful that the sporting world generally and those who read of sparring contests in the newspapers have regarded Mr. Jeffries and his predecessors as prize-fighters in the ordinary sense.

In the early part of November last some of the members of the company called on the Mayor of Cincinnati and consulted with him relative to a permit for a sparring contest. He knew his visitors very well and their standing in the community, and was aware of their connection with the Jubilee Saengerfest and of the fact that they owed a large sum of money because of it. He told them he would give them a permit, and they proceeded with their plans through Mr. Witte. They laid their plans before the mayor, and he approved of them so far as he was cognizant of them. He saw the contract hereafter to be referred to made by The Convention Hall Company with Mr. Brady, but did not at any time so far as appears see the agreement between Mr. Jeffries and Mr. Ruhlin, a paper hereinafter set forth.

After this meeting, just when does not appear, the company or some of its officers were told by the mayor that he could only issue a permit to an athletic club.

In the meantime, and before that information was given, the following agreement was entered into December 8, between the Convention Hall Company and William A. Brady acting in behalf of Mr. James J. Jeffries:

ARTICLES OF AGREEMENT.

This agreement entered into this eighth day of December, A. D., 1900, between The Convention Hall Company, of Cincinnati. Hamilton county, Ohio, party of the first part, and William A. Brady, of New York City, New York, acting in behalf of James J. Jeffries, parties of the second part:

WITNESSETH—That whereas, it is the purpose of the party of the first part to enter into an agreement with the parties of the second part, whereby the Hall owned by the Convention Hall Company, can be used for the purpose of liquidating the debt incurred by the Board of the Jubilee Saengerfest, it is agreed between the parties hereto:—

FIRST:—In consideration that the party of the first part shall at any time between February 1st and February 14th, 1901, permit the parties of the second part herein, the use of Convention Hall, located in Cincinnati, Hamilton County, Ohio, for the purpose of conducting in Convention Hall, Two (2) Boxing contests, towit:— One preliminary contest, not exceeding ten (10) rounds, and one principal contest of twenty (20) rounds.

SECOND:—The party of the first part agrees to allow and pay to the party of the second part seventy (70) per cent of the gross receipts from the tickets of the said contest, leaving to the said Convention Hall Company, thirty (30) per cent. of the gross receipts from tickets (except as otherwise hereinafter provided), as compensation for the use of said Hall, and the privilege of giving said contest in said Hall, settlement to be made immediately after said contest has been concluded.

Said settlement to be made from a box office statement controlled by account of the tickets in the boxes, said box office statement to be rendered before the ticket boxes are opened. All moneys so received shall be held by the Convention Hall Company, until said contest is over, when they shall pay over to the said party of the second part, seventy (70) per cent. of the gross receipts, retaining as expenses the amount hereinafter provided for in this contract.

THIRD:— The parties of the first part agree to erect a twenty-four (24) foot ring in center of building, build private boxes, said boxes to have a seating capacity of not less than two thousand (2,000) and re-arrange the seats in the building, so that the contest may be properly given and properly seen by the public in said Hall.

The alterations to be made in accordance

with diagram furnished by party of the second part, said diagram of alterations to be agreeable to party of the first part. In consideration of the Convention Hall Company going to the expense of these necessary changes, the party of the second part agrees to allow said Convention Hall Company to retain fifteen hundred dollars ($1500.00) from their share (meaning, "from the share of the party of the second part") of the gross receipts, and further agrees on consideration of the Convention Hall Company going to the expense of these necessary alterations to accept sixty-five (65) per cent. of all moneys taken in for tickets over sixty thousand dollars (60,000.00) dollars. All other expense attending the conducting and promoting of said contest to be paid by the party of the second part herein, excepting, towit:—Each person or persons employed shall be paid by the party employing such person or persons, and such employed persons to be agreeable to both parties hereto.

FOURTH:— It is herewith agreed between the parties hereto that in the event of said Convention Hall burning down or being so badly damaged by fire, as to render it unfit for the purposes herein intended, neither party shall be liable to the other party for any amount.

The contestants in said principal contest, hereinbefore stipulated shall be James J. Jeffries, Champion of the World, and Gus. Ruhlin, of Akron, Ohio, but in case that said Ruhlin is defeated by Peter Maher, in Philadelphia, December 17th, then the principal event shall be a contest between said Jeffries and Thomas Snarkey, of Ireland.

FIFTH:—The sale of all the tickets shall be conducted by such person or persons selected by and representing the party of the first part, residents of Cincinnati, and such representatives of the parties of the second part as may be agreed upon by the parties hereto, at the expense of the party of the second part. All announcements or advertisements of the contest shall state that it is being given under the auspices of the Convention Hall Company for the benefit of the Saengerfest deficit.

SIXTH:—Each party shall be allowed not exceeding one hundred and seventy-five (175) passes, which shall include those for the use of the press and authorities, and all passes other than those herein provided for shall be counted as paid admissions and charged to the party issuing same.

SEVENTH:—No police officers other than the superintendent and the inspector of police and officers detailed for duty at said Convention Hall, holding proper credentials, authorized by the mayor, at the time of said contest, shall be admitted without pass or ticket of admission, and the Hall in the evening of said contest shall be under the control and subject to the regulation of the said party of the first part, and of the mayor of the city, provided that such regulation shall not be inconsistent with any of the terms of this agreement.

EIGHTH:— Both parties hereto shall have a representative at each door of admittance to said Convention Hall, and the taking of all the tickets of admittance shall be by such parties appointed by said party of the first part, provided that they are satisfactory to the parties of the second part.

NINTH:— The date of said contest shall be agreed and named on or before January 1st, 1901, and the names of the persons who are to take part in the said contestsshall be then agreed upon and the same evidenced in writing and signed by all parties thereto, and said writing shall be part of this agreement; but the conditions of said writing shall not take priority over this instrument which shall be final and binding to both parties to this agreement.

TENTH:— Both parties hereto as evidence of good faith to carry out the purpose of this agreement agree to deposit with the —— Bank of Cincinnati Ohio, the sum of five thousand ($5,000.00) dollars, which shall be forfeited by the party failing to carry out the provisions of their agreement.

This clause to mean that if these contests are prohibited or interfered with by the mayor of Cincinnati or the govenor of the state of Ohio, then the Convention Hall Company shall forfeit the above mentioned five thousand dollars, to said W. A. Brady and Jas. J. Jeffries without quibble or legal interference. And it shall be understood with bank holding the deposits, that they are to be forfeited as stipulated herein.

The party of the second part also agrees that in case they fail to carry out their part of the agreement, to forfeit their deposit without quibble or legal interference: death or sickness, which would prevent either of the defendants in the principal contest from engaging in same, to release them from the requirements of this instrument.

ELEVENTH:—All profits resulting from the sale or from the granting of any privileges of concessions to any telegraph companies, moving picture concerns, programs, sale of refreshments, excepting intoxicating liquors, shall be

divided on the basis of thirty (30) per cent. to the party of the first part and seventy (70) per cent. to the parties of the second part.

No concessions or liability of any kind shall attach to either party not herein expressly stated and provided for.

TWELFTH:— Price of admission to contest shall be mutually agreeable to both parties.

THIRTEENTH:— This agreement shall be in full force upon the signing of the parties hereto and that said sums of five thousand dollars ($5,000.00) have been deposited, which said acknowledgment has been made a part hereof.

FOURTEENTH:— It is agreed that William A. Brady shall act as manager and director of all business details connected with the contest, and shall be subject to no interference of any of the parties hereto, unless his actions be inconsistent to this agreement."

(In pursuance of the agreement, each party deposited $5,000. with a bank agreed upon.)

On December 13 the company approved of this contract by resolution, and directed its execution by the officers.

A meeting of the directory of the company was held December 17 at which the question of an athletic club was discussed. The president telephoned to Mr. Ramsey asking if the name of the Convention Hall Company could be changed to an athletic club. He replied, reading the law through the telephone. The president said that the method provided by law would take too long, whereupon Mr. Ramsey said that the incorporation of a new company would be the better plan if haste were involved.

On the same day the president again called up Mr. Ramsey with reference to the formation of an athletic association, but Mr. Ramsey had gone home,, as it was late in the afternoon. Mr. Witte was with the directors at the time, and volunteered to draw up an application for articles at once. This was done. The name adopted was "The Saengerfest Athletic Company." The capital stock was $310.00, and the purpose of its formation was "promoting physical amusements. It was a corporation under the laws of Ohio for profit. Mr. Ramsey was not consulted at any other times than these, and when learned that his partner, Mr Maxwell, had protested publicly as will hereinafter appear, he with the consent of the company, withdrew from further employment.

The occasion for the existence of the Athletic Association will appear in section 6890 of the laws of Ohio, which reads as follows:

"Any two persons who agree, and willfully fight or box at fisticuffs or engage in any public sparring or boxing exhibition without gloves of any kind, and whoever aids, assists or attends any such boxing exhibition or glove fight, and any owner or lessee of any grounds, lots, building, hall or structure of any kind, permitting the same to be used for such exhibition or purpose, shall be deemed guilty of an affray, and shall be fined in any sum not exceeding two hundred and fifty dollars, or imprisoned not more than three months, or both; provided that nothing in the foregoing shall apply to any public gymnasium or athletic club, or any of the exercises therein, if written permission for the specific purpose shall first have been obtained from the sheriff of the county; or, if the exercises or exhibition are had within the limits of a municipal corporation, of the mayor of such corporation."

On December 17th the following agreement was entered into between the Convention Hall Company, Mr. Jeffries, and Gus. Ruhlin, known as "The Akron Giant". George Siler has a reputation as a good referee and in the capacity of referee officiated at Carson City and elsewhere.

### Exhibit 3.

Articles of agreement entered into this seventeenth day of December nineteen hundred between James J. Jeffries of California, Gus. Ruhlin of Ohio and The Convention Hall Company of Cincinnati.

WITNESSETH: 1st, Said James J. Jeffries and Gus. Ruhlin agree to box twenty rounds according to the Marquis of Queensbury rules at the Saengerfest Hall Building Cincinnati Friday evening, February 15 between, 9 and 11 P. M.

2. The men agree to wear gloves not exceeding five ounces in weight.

3. The contestants agree to accept George Syler as referee.

4. The Convention Hall Company agrees to pay the contestants fifty-five (55) per cent. of the gross receipts taken in on the evening of said contest in payment for their services. Winner to receive 75 per cent. of said 55 per cent. of gross receipts.

5. The Convention Hall Company further agree that if any moving pictures are taken of the contestants, Jeffries and Ruhlin shall receive fifty (50) per cent. divided equally, of the revenue derived from the exhibition of said pictures.

6. James J. Jeffries and Gus. Ruhlin agree to post twenty-five hundred ($2500) dollars with —— Bank of Cincinnati, Ohio, as an evi-

dence of their good faith and agree to forfeit said twenty-five hundred ($2500) dollars without quibble or legal interference in case they fail to fulfill the obligations required under this contract. Death which will prevent either of them from engaging in this contest to release them from the requirements of this clause.

7. The Convention Hall Company of Cincinnati agrees to post twenty-five hundred ($2500) dollars with —— Bank of Cincinnati, Ohio, as a guarantee that they will bring the contest off on the date mentioned. In case of their failing to do so, the said twenty-five hundred ($2500) dollars to be divided equally between the two principals in said contest. This clause to mean that if this contest is prohibited by the mayor of Cincinnati or the Governor of the State of Ohio, or any one else legally authorized, then The Convention Hall Company of Cincinnati shall forfeit the above mentioned twenty-five hundred ($2500) dollars to the said Jeffries and Ruhlin without quibble or legal interference.

8. It is herewith agreed between the parties hereto that in the event of said Convention Hall burning down or being so badly damaged by fire, as to render it unfit for the purposes herein intended, neither party shall be liable to the other party for any amount.

9. Parties to this agreement shall be entitled to full and unrestricted representation in all box offices and doors of Saengerfest Hall on the night of the said contest. Also The Convention Hall Company, Ruhlin and Jeffries to mutually agree on prices for tickets and amount of complimentary and pay face value for every ticket taken at the doors.

10. All other stipulations and agreements not covered in these articles to be governed by the agreements already existing between James J. Jeffries and Gus. Ruhlin, or the referee.

In witness whereof ,the parties hereto have hereunto set their hands and seals on the day and year first above mentioned.

In the prseence of          Gus. Ruhlin,
   Billy Madden,          Jas. J. Jeffries,
   L. E. Weed.          per. Wm. A. Brady.
      The Convention Hall Company,
    per, William N. Hobart, President.

On December 24 the entire thirty-one shares of stock in the Athletic Association were subscribed by fifteen persons ,most of them taking one share, one taking five shares, and four taking four shares each. The subscribers were all members of the Convention Hall Company and had been members of the executive committee of the Jubilee Saengerfest. On that day the

stockholders resolved that a board of directors to consist of five members, should be elected annually, and that the officers consist of president, secretary and treasurer, and the directors were authorized to carry out the details of the contract with Brady of December 8th which was on December 24th transferred by the Convention Hall Company to the Saengerfest Athletic Association Company. The directors were duly sworn in. No attempt at any time was made by the company or the mayor to ascertain the views of the governor about such a contest. They did not know what the Marquis of Queensbury rules are, nor did they make any effort to ascertain. These rules as published by Mr. Richard K. Fox, Editor and proprietor of the New York Police Gazette, a recognized authority in the sporting world, are:

## MARQUIS OF QUEENSBURY RULES.

1. To be a fair stand-up boxing match in a twenty-four-foot ring, or as near that size as practicable.

2. No wrestling or hugging allowed.

3. The rounds to be of three minutes' duration, and one minute time between rounds.

4. If either men fall, through weakness or otherwise, he must get up unassisted, ten seconds to be allowed him to do so, the other man meanwhile to return to his corner, and when the fallen man is on his legs the round is to be resumed and continued until the three minutes have expired. If one man fails to come to the scratch in the ten seconds allowed, it shall be in the power of the referee to give his award in favor of the other man.

5. A man hanging on the ropes in a helpless state, with his toes off the ground, shall be considered down.

6. No seconds or other person to be allowed in the ring during the rounds.

7. Should the contest be stopped by any unavoidable interference, the referee to name time and place, as soon as possible, for finishing the contest; so that the match must be won and lost, unless the backers of both men agree to draw the stakes.

8. The gloves to be fair sized boxing-gloves of the best quality, and new.

9. Should a glove burst or come off, it must be replaced to the referee's satisfaction.

10. A man on one knee is considered down, and if struck is entitled to the stakes.

11. No shoes or boots with springs allowed.

12. The contest in all other respects to be governed by revised rules of the London Prize Ring.

What these rules are does not appear.

Mr. Madden attempted to show that these rules had been modified two years ago. The court finds that these rules were to govern the contest by the agreement.

The contest of Messrs. Ruhlin and Maher came off at Philadelphia on December 17. The result was to determine whether Mr. Ruhlin, or Mr. Sharkey of Ireland, was to meet Mr. Jeffries on February 15th in Cincinnati. No inquiry was made by the company or any of its members, so far as it appears, or the mayor, as to whether it was brutal or otherwise. The daily papers' account, if true, would indicate that it was a cruel exhibition. The papers were permitted to be in evidence ,not for the purpose of proving the character of that affair but because the court was of opinion that it was the duty of the members of this association to investigate it and to ascertain whether it was brutal or not; that under the circumstances the newspaper accounts would put the company upon inquiry and require an investigation by them, and if they had not seen the newspapers they could easily have done so.

Mr. Brady was entrusted by the Convention Hall Company to arrange for a preliminary contest. An agreement was made by him for the company by which two negroes, Messrs. Childs and Martin, engaged to appear on February 15th, under the following contract:

"Articles of agreement, between William A. Brady representing the Convention Hall Company of Cincinnati, party of the first part, Frank Childs of Chicago, and Ed. Martin of Denver, party of the second part.

The party of the first part agrees to give a purse of five hundred ($500) dollars for a ten round sparring contest between said Frank Childs and Ed. Martin to take place at Convention Hall Cincinnati, Friday February 15, 1900.

Parties of the second part, said Childs and Martin, agree to spar ten rounds on their merits in consideration of said purse.

George Siler to act as referee.

Purse to be divided $400 to the winner and $100 to the loser."

The phrase "on their merits" means that contestants shall not "fake," that is, fall down before a round is over, but shall stand up and take such punishment during a round as cannot be warded off.

The prices for seats about the arena were fixed at $35 each for choice locations, and $25, $15, $10 and $5, in the inverse order of excellence.

Apparently no further corporate action looking to further athletic and gymnastic performances was taken until January 22, although it is said that various plans were discussed covering exercises of that kind to be developed in the future; and it is also in evidence that there was at the time the club was formed a discussion of what might be done by it in the future, including performances of the kind which was billed for the 15th of February; and it was thought that if the performance on that day was so successful that from its proceeds the promotors' debt might be paid and a surplus left, that then a permanent building might be constructed for the purposes of the club.

It appears too that at the time the question of the admission of associate members to the club was so far gone into that a resolution to that end was prepared by the counsel of the company, but was never acted upon by the club as such; such members would be elected by a majority vote, must sign the roll, and pay an initiation fee of one dollar; they were privileged to attend any meeting, and to vote upon questions of business and other propositions except the election of officers, and might not become directors.

On January 8, in response to the mayor's request, Mr Wade H. Ellis, assistant corporation counsel, gave to the mayor the following opinion in writing:

"Cincinnati, January 8, 1901.

"Hon Julius Fleischman,

Mayor of City of Cincinnati.

"Dear Sir :-

"You have asked for a written opinion from this office as to your powers and duties with reference to the granting of a permit for the proposed pugilistic contest at Saengerfest Hall on February 15, 1901. In reply thereto I beg to advise you as follows:

"First, You have no authority to grant a permit for a prize fight. This, of course, requires no further statement. A prize fight is a felony in Ohio.

"Second, You have authority under section 6890 Revised Statutes, to grant a permit for the giving of a sparring or boxing exhibition if the same is to be conducted by a public gymnasium or athletic club.

"There are thus presented two questions for you to consider before acting upon the application now before you. The first question is whether or not the proposed contest is to be a prize fight, and the second is whether or not it is to be a sparring or boxing exhibition by some public gymnasium or athletic club. Be-

fore your discretion can be invoked in the issuance of a permit, those asking it should show affirmatively that the exhibition they propose to give comes fairly within the special exception in section 6890. If you have not received from such persons sufficient information to convince you that this contest will not be a prize fight and that it will in fact be a sparring and boxing exhibition under the auspices of a public gymnasium or athletic club within the meaning of the statute, you have no authority to grant the desired permit.

"Assuming therefore that before issuing such permit you will require all the contracts and other details necessary to satisfy your judgment upon this question, if you have not the information now, I have investigated the law upon the subject for your application to the facts as they are now before you or as they may hereafter be presented by those requesting your favorable action.

"A prize fight has been frequently defined by the courts of Ohio and other states. In the case of the State of Mississippi v. John L. Sullivan, 67 Mississippi, 352, the supreme court of that state, reviewing the dictionary definitions of the term prize fight, define such a contest substantially as follows: 'A prize fight is a pugilistic encounter or boxing match in public for a prize, wager or reward'. Other courts define it to be an engagement between two persons contesting with their fists for phycisal supremacy, intending in some degree to do bodily harm to each other expecting as a result of the contest to receive some honor, reward or emolument. It makes no difference whether the contest is with or without gloves, nor what kind of gloves are used. Reg. v. Orton, 39 Law Times 293. It makes no difference in Ohio whether the contest is given in public or private. Seville v. State, 49 O. St.,117. It makes no difference whether the bodily harm inflicted or intended to be inflicted is slight or serious; nor whether the contestants are friends or enemies; nor whether the contest is for "points", as it is called, or "to a finish"; nor whether it is for a limited number of rounds or until a decision is rendered. It is nevertheless a prize fight if the principals to it meet by agreement between themselves, or by their authorized agents, or any other persons and enter a ring, or its equivalent, and for money or other valuable consideration strike each other with the intent to injure in order to win a victory. This has been decided by the supreme court of Michigan in the case of People v. Taylor, 56 Northwestern Reporter,

27. While the court in that case reverses the judgment of conviction because of the indefiniteness of the charge of the trial judge, nevertheless it clearly points out the characteristics of a prize fight.

"From these decisions it will be seen that the courts take a common sense view of the two words, Prize and Fight, and declare in substance that there must be a prize offered for the fight and a fight given for the prize. The fight given need not be brutal or fatal, it may even be friendly and the amount of injury done may be slight. But it must be a fight. So the prize given need not be in any particular form; it may be an honor or a fixed sum or a proportion of the receipts taken at the door." But it must be a *prize*. Nor does it make any difference how this prize is divided or paid. As the Supreme Court of Kansas says in the case of The State v. Purtell, 56 Kansas 482. 'It makes no difference whether the prize or reward is to be won by the successful contestant from the other, or to be awarded by third parties. Nor do we think it indispensable that the prize or reward should be given to the successful contestant alone though there must be a prize given in the contest. The evil designed to be remedied by the statute is that class of brutal exhibitions, for the giving of which considerable sums of money were paid and we do not think the statutes can be evaded by rewarding the unsuccessful as well as the successful combatants.'

"If therefore the proposed contest at Saengerfest Hall is between two well known professional pugilists for the championship of their class or a division or a per centage of the gate receipts or for any other compensation however paid or in whatever proportion; and if in said contest said principals intend to fight each other and inflict bodily harm in whatever degree for the purpose of winning such championship or other reward; then this contest is a prize fight no matter what those managing the affair call it, whether a sparring or boxing exhibition for "points" or a limited number of rounds or by any other name. And such a contest is against the laws of Ohio no matter whether sanctioned by your permit or not. Nor will such a permit shield the participants from arrest. Its only effect would be to give a promise of the law's protection to those who attend the exhibition which would not avail them if the event thereafter occurring at Saengerfest Hall should turn out to be unlawful.

"With this understanding of the offense of prize fighting, your Honor must decide, upon

a consideration of such facts as you now have or may hereafter obtain, having in view the character and reputation of the principals in the proposed contest, the purpose of that contest and the expectation in the minds of those who propose to attend the same from all parts of the country, as to just what its meaning and nature is. And if the event to take place on February 15th answers the description of a prize fight as I have attempted to define it, you would not be justified in issuing a permit which might be used as a means of violating the law.

"The second question to be answered is whether or not, even if the proposed contest is not a prize fight, it can be legalized under section 6890 Revised Statutes, by the issuance of a permit for an exhibition by a public gymnasium or athletic club. It must first be noted that section 6890 is a prohibitory and not a permissive statute. It makes any public sparring or boxing exhibition with or without gloves an affray punishable by fine and imprisonment, whether the same has any of the elements of a prize fight or not; and provides that the persons who agree to engage in such exhibition or those who assist or attend or the owner or lessee of any grounds, lots, building, hall or structure of any kind, permitting the same to be used for such exhibition or purpose, to be guilty of an affray and so punishable by fine and imprisonment. The special privilege granted to a public gymnasium or athletic club by a permit of the mayor, is an exception to this statute and does not express its main intent or purpose. That intent is to prohibit public sparring or boxing exhibitions of whatever character, and the exception is to permit such exhibitions when given by a public gymnasium or athletic club and when constituting any of the exercises therein. You are thus brought to the inquiry: What is a public gymnasium or athletic club within the meaning of this exception? Is it an organization formed for the purpose of giving a single boxing exhibition, organized a few days before the exhibition is to take place and disbanded immediately thereafter, having in view nothing except to fulfill the technical letter of the law and evade its spirit? In New York under the Horton law authorizing such exhibitions by athletic clubs, one of the requirements was that the association should have leased its quarters for a period not less than one year, thus showing the legislative intent that the athletic club should be a bona fide organization having some permanent object. Is the privilege of giving such an exhibition under the Ohio statute fairly earned if the athletic club or gymnasium is in the common knowledge of all formed for the sole purpose of legalizing an exhibition which otherwise would be unlawful? It seems clear that a public gymnasium or athletic club in order to merit the special privilege thus granted by the law, should be all that its name implies. It should be an association not organized for the single purpose of evading the consequences of a violation of section 6890, but one having a more permanent purpose to serve in encouraging healthful and manly exercises, such as the Cincinnati Gymnasium or Turnerverein.

Our Supreme court says in the Standard Oil case, 49 O. S., 137, "That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but like every other fiction of the law, when urged to an intent and purpose not within its reason and policy, may be disregarded." So we may disregard the technical claim of an athletic club if the purpose of its formation is not early within the season and policy of that section of the statute which gives to it as such an association a special privilege not accorded to others. Can the Saengerfest Athletic Club, formed for the avowed purpose of paying a debt contracted in a far different enterprise, be called a public gymnasium or athletic club within the meaning of section 6890? Is not the very purpose confessed by its organizers in itself a denial of any right to the special privilege of this statute? Is it an organization formed for the promotion of athletic exercises, or is it engaging in athletic exercises with a different object in view? Is athletic sport the aim of this club, or is it a means to another end? When the debt is paid, to accomplish which this club was organized, will there be any further object in maintaining the club? If not, then the organization asking your permit is not an athletic club within the meaning of the statute.

In a recent charge to the grand jury by Judge Voris, in Summit County, reported in 7 N. P., 457, the court refers to the rights of athletic clubs under section 6890 and uses this language: "We also say to you that no exhibition which in its essential qualities is a prize fight, comes within the permissive provisions of the statute. Men who fight on wagers, or for a prize or a reward, such as the gate money, or with the accompaniments of

backers, referees or umpires, do not come, in any fair sense, within the permission of the statute: but on the contrary, are the very acts and persons denounced by the statute. Public gymnasia or athletic clubs, such as come within the contemplation of the statute, are not conducted nor legally recognized for any such purpose. It is only the legitimate exercises of such institutions that are excepted by the provisions of section 6890 Revised Statutes."

In conclusion I beg to say that I have considered this matter at length, not only because your Honor has asked for a full opinion upon the subject, but because of the publicity given to it in the community at large and the sincerity with which the proposed exhibition at Saengerfest Hall is both defended and condemned by citizens of the highest standing. In my judgment, unless a different state of facts is presented to you from that which now seems to be publicly avowed by those proposing to give the pugilistic contest on February 15th, said contest will be against the law of this state and you have no authority to grant the permit requested."

This is a most creditable document, and states clearly the law on the questions involved in it.

On January 4th the following appeal was made to the mayor, and it appeared in the daily papers of January 5th:

"To His Honor, Julius Fleischmann, Mayor:

Sir: We respectfully desire to submit to your careful consideration the propriety of devising some means to prevent the fight which is advertised to transpire in the Saengerfest Hall under your executive permit

"It seems to a very large number of citizens that you have made a too generous use of the power entrustd to your hands, for we understand that this power to prevent such encounters is to be very jealously guarded, and to be exercised only in behalf of associations in which the danger of brutality in fistic encounters is reduced to a minimum. It is quite clear in this case—in fact, we regard it as a moral certainty—that the exhibition must be the practical equivalent of a fight to the finish in order to warrant the spectators in paying the prices of admission. It is not necessary for us to restate all the arguments against this too free use of your power, for they have been often given to the public, but basing our calm judgment upon them, we can but feel that, as you must inevitably bear the responsibility of having this unfortunate (and, we must beg

to say, wrong) permission, it is incumbent upon you to find some way of extricating the city from what will be regarded as a tacit consent to a public exhibition of brutality which for years will bring the blush of shame to its face.

"We understand that you would be willing to reconsider the granting of that permit, save for the fact that you have given your word to the directors. We desire to ask you to gravely consider whether this promise is more binding than the official oath you gave to preserve the best interests of the city, which will be at least gravely imperiled by this degrading spectacle.

"Signed: The Committee of Citizens, Rev. Chas. F. Goss, Chairman; Bishop Walden; and others."

Very soon thereafter a written protest was lodged with the mayor, signed by fifteen lawyers. This reads:

"Hon. Julius Fleischmann,

"Mayor of Cincinnati.

"Dear Sir:-

"For more than thirty years prize fighting has been denounced by the law of Ohio as an infamous crime, to be punished by imprisonment in the penitentiary. Our Supreme Court has declared that the purpose of the statute is "to suppress all prize fighting, because of its brutality and consequent danger to human life, as well as the demoralizing and pernicious effects it has on the good order and well being of society." The statutes make it your duty as mayor "at all times of the day and night, within the boundaries of the city, to preserve the public peace, prevent crime * * and generally to obey and enforce all * * criminal laws of the state and of the United States."

"There would therefore seem to be but one course open to you in connection with the proposal to give a prize fight in Cincinnati.

"It is a common superfuge of the promoters of prize fights to seek protection under the pretense of giving a boxing exhibition, but the statutes of Ohio leave no room for such evasion. They make it a separate and distinct offense to "engage in any public sparring or boxing exhibition without gloves or with gloves of any kind", and provide for the punishment, by fine and imprisonment, not only of the principals, but of "whoever aids, assists, or attends any such boxing exhibition or glove fight, and any owner or lessee of any grounds, lots, building, hall or structure of any kind, permitting the same to be used for such exhibition or purpose." There is a proviso that this statute shall not apply to the exercises of

public gymnasia or athletic clubs if written consent for the specific purpose is first obtained from the mayor, but the exception relates only to bona fide athletic clubs or public gymnasia and furnishes no authority for a license to persons who organize a paper club for the sole purpose of holding a prize fight.

"The fact that the promoters have engaged the alleged champion heavy weight prize fighter of the world, the prices which they propose to charge for seats and the other announcements and declarations which they and the principals have made, leaves no room to doubt the real character of the proposed encounter. Unless it is to be a prize fight in which the contestants intend to inflict bodily harm upon each other, to the extent of their skill and strength, it will fail utterly to attract a crowd, which seems to be the sordid purpose for which the entire scheme is inaugurated; if it were to occur and the gladiators should not strike each other as hard and as often as possible, they and the promoters would be denounced as swindlers. To these facts of general knowledge, which you and all people well know, you have no right to close your eyes officially.

"As members of the Bar of Cincinnati and officers of the courts of justice, charged with the enforcement of the law, we feel it to be our duty to submit to you this public protest.

"Cincinnati, Ohio, January 9, 1901.

"Signed: Lawrence Maxwell, Jr., Gustavus H. Wald, Judson Harmon, E. W. Kittredge, J. W. Warrington, John W. Herron, Lewis N. Gatch, Thos B. Paxton, Edward Colston, Geo. Hoadly, Jr., A. W. Goldsmith, R. B. Bowler, C. W. Baker, Herbert Jenney, C. B. Matthews, Wm. Worthington."

These lawyers are among the most eminent at the bar. The newspapers published this document at the time, and its contents were known to the members of the new club. Whether or not the members knew the purport of Mr. Ellis' opinion does not appear. It was not made public until produced by the mayor on the witness stand.

On January 22 the club adopted this regulation and by-law: "The gymnasium of the association shall at all times (excepting on days when entertainments are given) be open for athletic exercises to all stockholders and the public in general under such restrictions as may be prescribed by the board of directors."

At that meeting a communication was read from Professor Gleason of Chicago, offering to give an exhibition with his horses "in our hall."

The club had no gymnasium nor permanent quarters of any kind. The hall had been sold on November 15, and delivery was to be made in the spring.

A gentleman connected with one of the Turner societies had become a stockholder on January 12, who reported to the meeting on January 30, "that he had consulted with the Turners and United Singers about an athletic entertainment to be given by our company in our hall February 10, 1901, at 2 p. m. Both organizations cheerfuly offer their services in making that exhibition a success. * * *

At the meeting of January 22, Messrs. William E. Brady, James J. Jeffries, E. G. Cook, Gus. Ruhlin and W. M. Madden were elected stockholders of the association. Mr. Cook is the representative of M. Brady. Mr. Ruhlin is he who defeated Mr. Maher at Philadelphia, and became thereby the selected antagonist of Mr. Jeffries. Mr. Madden, who signs his name "Billy Madden", was formerly according to his own testimony a pugilist, and is yet if Mr. Brady is to be believed. He is a trainer for those who engage as principals in sporting events such as the proposed contest, and is now performing that office for Mr. Ruhlin. These gentlemen are all non-residents, although Mr. Madden says that he has some thought of settling down in Cincinnati and opening a saloon. They were not consulted about their election, and did not know of it until after the fact. It is in evidence that they were made members so that the contest could be between members of the club, as required by law.

On January 10, the permit not being forthcoming, the twenty-two gentlemen formally petitioned the mayor therefor, the exhibition to be confined to two boxing contests, one, preliminary, not to exceed ten rounds, and one, principal, of not more than twenty rounds, "for the benefit of the deficit incurred by the Jubilee Saengerfest."

There still being some hitch in issuing the permit the directors of the club addressed the mayor January 23 as follows:

"Hon. Julius Fleischmann,
    Mayor of Cincinnati, City.

"Dear Sir:-

"Since making the formal application for the immediate issuance of the permit for the sparring contest to be given on February 15, 1901, by The Saengerfest Athletic Association Company at Convention Hall, for the benefit of the Saengerfest deficit, it has occurred to us that the motives prompting us in making such request have been misunderstood. From what

we have since learned we can easily comprehend how our motives could have been misconstrued. Our intentions to bring on this contest were sincere then, and are sincere now. Our fondest hopes and earnest desires are to carry this matter to a successful end. We have already let the contract for the alteration of the building and the tickets will be on sale in a few days. There has been considerable doubt in the mind of the public, both here and abroad, as to the ultimate outcome of this undertaking. To satisfy all doubt and to make the affair a financial success, it is to our minds absolutely necessary to have permit issued as soon as possible. While local patronage is assured, the final success of the undertaking will depend on the large numbers coming from abroad. We have the assurance, that if the permit is issued now, it will remove all doubts and bring a larger attendance than if it is withheld until a day or two before the contest. We feel certain that you appreciate the position in which we are placed by the slightest uncertainty that affects our plans, and for this reason we ask that you kindly reconsider your former determination and issue the permit to us, just as soon you can consistently arrange to do so.

Thanking you for the consideration you may give our request and trusting that you will favor us with an early reply, we beg to remain,

           Yours respectfully,

This produced the desired result, the mayor issuing January 25 the following:

"Mayor's Office. Cincinnati, Jan'y 25, 1901.

"Permission is hereby granted The Saengerfest Athletic Association Company, a corporation organized under the state of Ohio, to hold two sparring contests, one not to exceed ten rounds, and one not to exceed twenty rounds, at Convention Hall. Southeast corner Vine and Erkenbrecher Avenue, on February 15, 1901, by authority vested in the mayor under section 6890 Revised Statutes, Ohio Laws.

         (Signed) Julius Fleischmann,
                   Mayor."

On February 2 the folowing communication was sent to the governor of Ohio by a prominent business house, and a thousand other individuals as is it claimed.

            February 2, 1901.

"To His Excellency George K. Nash.
       Governor of Ohio, Columbus, O.

"Dear Sir:

"We are in receipt of your telegram in reply to message forwarded you today by some of Cincinnati's foremost citizens and business houses, in reference to the sparring exhibition proposed for the benefit of the Saengerfest deficit. In behalf of ourselves and some of the other signers we take the liberty of answering.

"We thank you for your expressions that the laws of our state be respected, and it confirms our impressions that the contest should and will take place. In our estimate it is for the welfare of Cincinnati and in no way prejudicial to its morals. Contests of this kind are permitted under section 6890 Revised Statutes of Ohio, and have been allowed to take place weekly, if not almost daily, since we can remember. Of course that statute describes the conditions, among which is the authority and consent of the mayor. In this particular case it means the consent of the Hon. Julius Fleischmann, a man whose sterling ability and integrity even you have seen fit to honor. It means not only his consent but absolute guarantee that he will see that no provision of that statute is violated. Placed at the head of the finest police force in the country, looked after by police commissioners appointed by you and your honorable predecessors.

We see no cause for state interference and we implore the lending of the state name to local proceedings in a local court in a purely local matter. There is quite a history connected with the Saengerfest and its subsequent deficit. The citizens constituting the Saengerfest Board were induced to act as directors, to extend the hospitality of our city (without expectation of profit or reward) to thousands of visiting singers and strangers. The financial failure and defict came over them, though through no negligence of theirs, and they are in no way to blame. Heavy judgments stand over the enterprise, and the proposed enforcement means financial distress, if not calamity, to many of them. This sparring contest is not the first movement to liquidate the debt, but all previous efforts to cancel it have failed, and, in fact, have added to the debt. These men are entitled to the sympathy of our people; they have ours, and we feel that, if you understood the situation as we see it, and as we do from the close promixity and friendly business relations with many of them, you would feel just as we do, and as nine-tenths of the people of Cincinnati feel about this matter. We sincerely believe that the contest will be strictly within the provisions of the law. We trust that our few words on this matter will convince you that there are two sides to this question, and, if sympathies count for anything,

that these people will have your sympathies and well wishes.

Yours respectfully,
The John C. Roth Packing Co.,
By Chas. E. Roth, Treas.

A further communication was sent to the governor by the Roth Co. and others;

"Cincinnati, O., February 2, 1901.

"To His Excellency George K. Nash,

"Governor of Ohio, Columbus, Ohio.

"The undersigned believe themselves just as law-abiding citizens of Cincinnati as those who telegraphed you under date of January 29. Eminent attorneys assert that there is nothing illegal in the proposed boxing contest, and we are satisfied that there is nothing prejudicial to good order or the standard of morals. We believe that this plan for raising money to pay deficit incurred in extending hospitality of our city toward visiting strangers, is entirely proper. The Saengerfest was neither a private enterprise nor was the result due to any negligence or bad business management as has been erroneously or maliciously charged. The payment of this debt concerns the city's honor, which should stand equally as high in the eyes of the world as its morals. The Saengerfest board is entitled to the sympathy and support of the people, and it should not be assailed and hampered by legal proceedings.

"Signed: The John C. Roth Packing Co., Joseph Taylor & Co., The Cincinnati Soap Co., The John Douglas Co., M. Marienthal & Son, Bode Wagon & Plow Works, A. Loewenstein & Sons, C. Wehmeier Bros., Huisemann Bros., Henry Loewenstein's Sons, The M. Work Co., The Auel Carriage Co., Martin &Riedle, The Dietz Machine Tool Co., Rombach & Groene, The Richardson-Hauser Printing Co., George Slimer, Rev. H. Baer, H. H. Suydam, August H. Bode, Albert Lackmann, Henry Bremefoeder, Louis Schmidtlapp, and a thousand more. Autograph signatures and list will be sent you by mail".

The following dispatch was received from the governor in response:

"Your telegram received. Unless all outward evidences of preparation are at fault, the enterprise booked for Cincinnati on the 15th of February will be a prize fight. It will not be permitted to come off, and the entire power of the state will be used to prevent it.

"George K. Nash, Governor."

Thereupon the governor received the following dispatch:

"Your telegram sent to the John C. Roth Packing Co. has been handed to us. It is not and never has been the intention to give a prize fight. The mayor's permit is for a boxing contest, and nothing will be done that said permit and the statutes do not authorize. It is not the intention to antagonize your authority nor the power of the state. Nothing will be done that will violate the law.

"The Saengerfest Athletic Association Co.,"

And the following dispatch was sent by him to the Saengerfest Athletic Association Co.:

"You are unfortunate in your preparations if the affair is to be a simple boxing contest. These all point unerringly to a prize fight. I will be governed by this evidence and the affair will not be permitted. If you persist you will find yourselves in conflict with all the power of the state".

The remonstrances of the ministers, the lawyers and the governor had no effect, and thereupon on January 29 the State of Ohio on relation of John M. Sheets, its Attorney General, brought this action against the executive committee of the Jubilee Saengerfest, Mr. Jeffries, Mr. Ruhlin, Mr. Brady, The Saengerfest Athletic Association Company and The Cincinnati Zoological Company, claiming that the proposed exhibition was to be a prizefight and against the law, that the athletic club was a sham, and that the proposed exhibition was a public nuisance: alleging among other things that the lives of the participants would be in danger and that "Said fight will bring together from all parts of the country a lawless, violent, turbulent, idle and dangerous assemblage of many thousands of persons: will incite quarrels and breaches of the peace, and will be an exhibition of brutality, and consequent danger to human life, and will have a demoralizing and pernicious effect on the good order and well-being of the community, and said assemblage and fight if permitted will constitute a public nuisance which will endanger not only the lives of the persons engaged or participating in it, but property generally"; and praying "that the defendants and each of them may be enjoined from holding said contest or encounter on the 15th of February next, or at any other time, in Saengerfest Hall, or at any other place within the state of Ohio, eihter under the name of a prize fight, or under the pretence of a sparring contest or boxing exhibition, or from participating in it, or in any wise aiding or abetting the same".

This petition was signed by J. M. Sheets, Attorney General, and as associate counsel by Lawrence Maxwell, Jr., Gustavus H. Wald, John W. Herron, J. W. Warrington, E. W.

Kittredge and Judson Harmon. The associate counsel volunteered their services without expectation of or desire for reward, and are entitled to the commendation of all good citizens.

The time for answer fixed by the statutes was February 16, but the defendants came in voluntarily and filed their answers so that the case might be heard as soon as possible on its merits, and not upon an application for a temporary restraining order.

The Cincinnati Zoological Company answered disclaiming any connection or concern in the matter set forth in the petition.

Messrs. Jeffries and Ruhlin answered as follows:

"They admit that they entered into an agreement to give an exhibition of their skill as boxers at the Jubilee Saengerfest Hall on February 15th, 1901; they say that said contest is intended and will be a friendly exhibition of the art of boxing; they say that there is no ill feeling between them and that there is no danger of any serious injury to either of them; that said contest is to be determined not by reason of any injury inflicted but in accordance with the skill displayed by them", and they deny the allegations of the petition.

William N. Hobart, Leopold Kleybolte, Geo. H. Bohrer, George Guckenberger, Frank A. Lee, Maurice J. Freiberg, Henry Muhlhauser, Sr., Louis Hudepohl, Julius Pfleger, Charles Kuhl, George F. Dieterle, Fenton Lawson, Edward Berghausen, John Hoffman, E. G. Zinke, Max Mosler, J. A. Kohner, G. W. Schuler, F. J. Diem, and The Saengerfest Athletic Association Company answered, setting forth how the debt was incurred, and that it was solely in the public interest and for the benefit of the people of Cincinnati; that the object of The Convention Hall Company was to give concerts and exhibitions to raise money to pay off the indebtedness, and to that end it undertook to give athletic exhibitions at the hall, and for that purpose entered into an agreement with Brady, Jeffries and Ruhlin to give an exhibition of the skill or said Jeffries and Ruhlin as boxers: that they were informed by the mayor that such a contest could only be given under his permit to a regularly organized athletic association. Whereupon a majority of them who were and are now interested in athletics as officers and members of the various gymnasiums or Turner associations in Cincinnati, organized The Saengerfest Athletic Association Company for profit, for the purpose set out in the articles of incorporation, with the

expectation of applying the profit of the exhibition to the payment of their debt, and expecting to give other lawful exhibitions and entertainments of an athletic nature, such as tend to promote physical culture, and generally to carry out the objects of such an association; and claiming that their association was *bona fide* under the laws of Ohio.

They say that they assumed to carry out the agreements between The Convention Hall Company and Brady, Jeffries and Ruhlin in order to give the exhibition complained of, and describe what it is to be, and say that "said contests are intended to and will be friendly exhibitions of the art of boxing, as there is no ill feeling between the proposed contestants and no danger of any serious injury to any of them, and said contests are to be determined, not by reason of any injury inflicted, but in accordance with the skill displayed by the respective contestants".

And they say that such contests are of daily occurrence in all gymnasiums throughout the country, and the art of boxing is taught by paid instructors in nearly all the larger colleges of the United States; and that exhibitions of precisely the same character are frequently given in all the larger cities of the state of Ohio through permits of the local authorities without objection by any private or public official, high or low, and without any pretense on the part of anyone that they constitute any public or private nuisance. And that they applied to and received from the mayor a permit under section 6890, and that they propose that the exhibition shall be given in accordance with the statutes. They deny that they intend to hold, promote or exhibit any prize fight or contention commonly called a prize fight. They say they "are law abiding citizens of the city of Cincinnati and state of Ohio where they are well known as active business and professional men, having large interests in the welfare of the community and to the promotion of which they have contributed much, both of time and money, and they do not propose to have it said of them that they are law breakers, without instantly challenging and contradicting the assertion as they now and here do by this, their answer".

They deny the character of the people who will assemble to witness the affair, but assert on the contrary that it will bring to Cincinnati many of the active and energetic business and professional men from all parts of the United States, whose presence will in many ways be of benefit to the city and its bus-

iness, and they make this statement not only from experience and information as to many similar exhibitions which have been held, but also from their knowledge of the class of persons to whom tickets for said proposed exhibitions have been sold, as said purchasers, so far as known, consist of the classes last aforesaid".

They deny that any nuisance will result, and assert that all reasonable precautions will be taken to secure good order, and that there is every reason to believe that the persons attending the exhibition "will be as quiet and orderly as the audiences are at theatres, and much more so than the average political convention or other assembly of that sort".

They deny that any property rights of any person or of the public are involved. And they say further that their co-defendants Bernhard Bettman, Hugo Eisenlor, A. W. Fuhrman, George Puchta, Warren J. Lynch, Conrad Krager, Charles F. Goetheim, George A. Firnstein, E. A. Urchs, Edmund K. Stallo, and Alfred Herholz are not members of The Saengerfest Athletic Association Company and are not interested in the action, and that Herman Pfitzenreiter died before the commencement thereof.

The gentlemen in whose favor this exception is made have answered disclaiming connection with the association. Some of them did petition the mayor for his permit. These will not be dismissed from the case. The others may be.

The Zoological Society, while it has no interest in the contest, is yet the owner of the land on which the building stands, and will not for the presence be dismissed.

This is an extraordinary case. The question of fact whether or not the proposed affair was to be a prize fight or a boxing match under the permissive clause of section 6890, would ordinarily receive but little consideration from a court of equity after it appeared that a prize was to be awarded the winner in it, but the character and standing of the gentlemen of this club being such as it is the court has set out at length the facts, or so many of them as it could recall. These are now submitted to the candid consideration of such of the fellow citizens of these gentlemen as will investigate them. The opinions of others are of no importance to anybody.

When it became known that Jeffries was to defend his title of "The Champion of the World" on February 15, not only sporting persons and persons with sporting proclivities were aware, but every person who reads the papers and keeps at all in touch with the world in which he lives, knew that the contest was to be a prize fight in the ordinary accepted meaning of that term. To such an extent did this opinion prevail that even an association of ministers of the Gospel felt it their duty to remonstrate.

The motives of these gentlemen cannot be impugned, and it is quite immaterial to what particular denomination or sect they belong, for, in the opinion of the court, preachers of righteousness of whatever creed or denomination or sect are conservators of the public and private morals, and their remonstrance against what they believe to be in itself morally wrong, as well as illegal, is entitled to the respectful consideration of all citizens.

Eminent members of the Bar, whose motives cannot be questioned, presented the situation in such a way that those concerned were fully advised that the proposed exhibition would be a prize fight under the laws of Ohio, or would be a fraud upon those who were invited from here and abroad at large expense to themselves to witness it.

From this and the opinion of Mr. Ellis the mayor was aware of the legal status of the affair and of his duty to the public he was elected to represent and whose trustee he was.

The Supreme Court of Ohio has declared only so long ago as in 1892 in Seville v. State, 49 O. S., 117, that such a proceeding is a prize fight, and that section 6890 granting permission in certain cases to hold certain contests does not apply to a prize fight. The case, State v. Aston, 29 W. L. B.; 117, does not in the slightest change or modify the former decision.

"An agreement to engage in a prize fight, is a conspiracy to commit a crime"; says the court, and of course all aiders and abettors are as blameworthy as the principals, although their punishment may be less severe. The Supreme Court say, page 134 of the report:

"The term 'prize fight', has no technical legal meaning. The Century Dictionary defines it as 'A pugilistic encounter or boxing match for prize or wager'; and other lexicographers who define it, give it substantially the same definition. It is used in the statute in its ordinary signification of a prize or reward, and includes all fights of that character, however conduted, and whether witnessed by many or by few people".

It is immaterial whether the Athletic Club was organized *bona fide* and as a permanent institution or not, or even had been in exist-

[COPYRIGHT, 1901, BY CARL G. JAHN.]

ence for years with proper equipment and appliances for athletics of various kinds; such an institution could not exhibit such a contest as this under any circumstances.

The evidence has justified the ministers and the lawyers and the governor to the fullest extent.

It is true that Mr. Madden would have the court believe that the affair was scarcely more serious than a boy's fight in the lot behind the school house, but Mr. Madden was not sincere. If the lawyers needed any vindication for their protest it is found in the testimony of Madden and of Brady.    When the kind of affair which Madden described would take place on February 15, as narrated to Mr. Brady and his opinion asked of it, he said that such a meeting would be "a fake" and there would not be thirty dollars in the house.

The minutes of the club of January 31 show this:

"Mr. E. G. Cook came in and reported an unusual sale of seats for the contest, and predicted from the advance sale that we would have over a hundred thousand dollars in the house".

There can be little doubt that if no opposition had been made the receipts would have been a sum much greater than this.

From Madden and Brady may be gathered that there are three kinds of sparring contests; first, a fight in which the contestants fight to a finish with their bare fists; second, a boxing match with light gloves to a finish; third, a boxing match with light gloves for a limited number of rounds for points.    A point is a measure of achievement according to all the rules of the science.    Just what these rules are does not appear.

If there is any distinction between these, it lies in the fact that there is a difference between the use of bare fists and fists covered with gloves. There may be some, but every championship contest since the brutal fight of Sullivan and Kilrain eleven years ago has been with gloves presumably "not exceeding five ounces in weight", and the court is justified in finding that the use of gloves does not take away from such contests their essential features.

A further distinction made in favor of a contest for a limited number of rounds appears in that if both men hold out until the last round is over and neither has been "knocked out", knocked senseless, or, as put by Mr. Madden, become tired or exhausted by dancing around the ring and defending himself—although what he had to defend himself against does

not appear from Mr. Madden's testimony but is left to inference—then he who has secured the larger number of points, is declared winner. But to the end of the round limit there is no distinction between these fights.    It is to the interest of a combatant to knock his opponent out before the limit is reached, for it is easy to see how the man who had secured the smaller number of points could become the victor by doing so.

To be "knocked out" is to be put in such a state that neither hope of glory, nor desire for the prize money, nor the love of victory will rescue a man while a certain number is being counted against him, from the miserable physical condition to which he has been reduced by his opponent's blows and his own exertions.

Such an affair is a prize fight, not only because a prize is at stake, but in the ordinary sense, because it is brutal, is unmanly, in that it puts a man on a level with fighting beasts. It may even result in the death of a combatant, and is shocking to a man of ordinarily refined sensibilities.

This is the kind of an entertainment it is proposed to give; but the defendants say they do not intend this; that the affair is to be but an exhibition of skill of trained athletes, that the mayor has promised to be on hand with police, and he and they will interfere if the matter takes on any of the ordinary prize fight features.

The court believes that the gentlemen have persuaded themselves that this is so.    To such extent do they rely on the mayor that from the testimony of the president of the association they have absolved themselves from all responsibility and have cast it upon him, even to the extent of accounting themselves free from blame if death should result to one of the contestants, or riot be one of the issues of their meeting.

That he was willing to become the referee of the fight to determine when it had gone far enough is frankly admitted by the mayor, though that he knew that he was to be made the scape goat of others' responsibilities does not appear.    The mayor says he gave the permit because he thought he had power under section 6890, to do so, and because he believed the representations made to him by reputable citizens that the law would not be violated and that the exhibition would be strictly a boxing contest, and for the further reason that he was merely following precedent in his office.

Apparently this is putting the responsibility back on the promotors.    But he says further that he is the head of the police force of the

city, and that he would deputize officers to keep an eye on the exhibition who would receive instructions to see that it came strictly under the limits of the permit. This question was asked him: "Did you see anything in this entire transaction by the negotiations that you had with these gentlemen, or was there anything that could cause you at any time to doubt that this exhibition was not what it was reported to be"? Answer. "There was not. It wouldn't have made any difference if there had been,—we would have charge—the police force would have entire charge of the affair". ·

He testified that he attended a performance at Robinson's Opera House under mayor Tafel's administration. This was "a very brutal performance", a limited contest of rounds, he thinks ten rounds. It was brutal because a man was knocked out, knocked down and knocked senseless, but whether there was any blood or not he does not remember. This was under a permit for a boxing contest.

He did not know under what rules the affair under discussion was to be had, and it does not signify, he says, what they were. He did not know anything of the preliminary contest between the negroes. The police were to be in entire control, but he made no condition that a man should be there to stop the fight if one of the combatants could not help himself, he "would be entitled to do that anyhow without imposing that condition. I told them", said he "that the affair would not be allowed to be brutal. As soon as one man was unable to defend himself it would have to stop". He expected that it might happen that one might become in such a condition as not to be able to defend himself, but thought that he would stop the proceeding if a man became at all helpless, so that he could not defend himself in a scientific way. He knew the fight was for the championship of the world, and believed that they would fight for a prize. He knew that fighting for a prize even in a boxing contest, with or without gloves, in public or in private, was contrary to the law of the state. He was of opinion that men trained and worked for a long time to get themselves into proper physical condition to stand up for twenty rounds, and believed that such a contest was tiresome, the mere standing up for one hour and jumping around a ring without defending or striking a blow, but he expected that they would strike each other hard. He was asked: "Is it practicable for anyone to know at what time a powerful blow is going to be delivered that will knock the other man senseless"? Answer:

"I should judge that it would not be". Question: "In other words, if those two men are there, each one of them trained for months to the highest point of physical power, contending for the championship of the world and a great money prize, it would not be possible for anybody that you would appoint to know the second at which the blow might be given by either one that would knock the other senseless"? Answer. "It would not".

His opinion is that the training is for the purpose of enabling the contestants to withstand bodily harm, to endure, and not to succumb, and he judged "that the purpose of the other fellow is to make that man to succumb under it if he can". But he would have issued the permit to any other person than the Saengerfest directors if such person had come for the same purpose. In his opinion there is not a great deal of danger of bodily harm with two men who are trained physically for this contest. By this, he means permanent injury; the injury would not amount to more than fifteen or twenty minutes. It might smart for a few moments, he says, but if a man were knocked down he would get up, and he has seen such men knocked insensible and has seen them on the street within an hour; and if a man remained unconscious from a knock out blow for an hour he would not regard that as very serious; and he would not allow a man to enter the ring who was not in condition. He says also that he would issue a permit under the same circumstances again.

Section 6888 provides:

"Whoever engages as principal in any prize fight shall be imprisoned in the penitentiary not more than ten years nor less than one year." Let us not deceive ourselves. That which the mayor has described and is willing to permit not only a prize fight within the meaning of the law as declared by the supreme court because it is a fight with gloves for a prize, but it is a brutal exhibition of physical force trained to the highest degree of power and endurance, and is gladiatorial in its nature. It is that which has come under the ban of civilization, which laws are passed to prevent if possible, and to punish, and a form of amusement, as said by our Supreme Court, brutal as well as demoralizing and pernicious in its effects on the good order and well being of society.

Quite different is a boxing match in a gymnasium or athletic club, institutions organized by men of serious purpose, who appreciate the

need of physical culture and exercise so that they may be the better fitted to pursue the ordinary vocations of life, occupations honorable and useful, or profit to themselves, and which organized society requires should be carried on for its needs. Boxing is a favorite form of amusement and is healthful exercise for men of use in the world and with whose pursuits it has no connection, but is merely incidental with other forms of exercise to the proper maintainance of the physical nature. In this sense and no other the term "boxing exhibition" is used in the permissive clause of section 6890, and it should not be forgotten for a moment that even such a boxing match for a prize is under the law of Ohio a prize fight, and cannot be given.

The mayor and these gentlemen are banded together to commit a crime. So says the Supreme Court, and it is undoubtedly true however unwittingly they find themselves in such an unfortunate position. The court willingly believes that they do not think so. The court is personally acquainted with most of them and has warm friends among them. Their characters and reputations have been beyond question. What hypnotism has blunted their appreciation of the true situation is beyond their comprehension. It cannot be it is that desire for gain, which in the opinion of many is sapping the moral foundations of our public and private life. But they say through their counsel, that even this proposed contest is illegal and is a prize fight, a court of equity is powerless to prevent it. They say that equity never interferes when there is an adequate remedy at law. This is so, but is there an adequate remedy at law here?

Section 7117, Revised Statutes, provides that when certain officers have reason to believe that any person is about to engage as principal or second in a prize fight, or is in training for such purpose as principal, he or they may be taken before a judge or magistrate, and if the complaint is true he may be held in bail with sufficient sureties in a sum not less than five hundred nor more than ten thousand dollars that he will not engage in any similar fight within one year in this state or elsewhere.

If any one fact appears clearly in the evidence it is that the proposed fight will net the fighters and promoters very large sums of money. The persons who might be arrested as seconds might not and probably would not if under a $10,000 bond each, appear in that capacity at the contest, so that at most a forfeit of $20,000 would be the maximum. This sum is so small that they could take their chance on the forfeiture and still reap great rewards. This is not an adequate remedy.

The participants after the fight may be indicted and sent to the penitentiary, but this is after the fact, and does not prevent the evils, which this action is brought to void.

An action in quo warranto under sections 6761 to 6780 inclusive against the athletic club is no remedy, because no provision is made for injunction, and it was too late at the time this suit was brought to obtain relief under these provisions. The mayor is the conservator of public peace in the city, but he openly defies the law with full knowledge and is in league with those who are about to break it.

Section 7119 reads:

"Where a sheriff has reason to believe that such fight or contention is about to take place in his county, he shall forthwith summon a force of citizens of the county sufficient for the purpose to suppress such fight or contention, and arrest all persons found thereat violating any law, and take them before a judge of common pleas or a magistrate to be dealt with as provided by law."

The sheriff can summon a posse to stop the fight when it is actually on and the law is being violated, and no doubt he will do so if need be, but this remedy does not meet the case. This suit is not brought merely to stop the actual fighting of the principals on that occasion. If that were all there were to it, the criminals could be dealt with according to law, for it is well settled that equity will not enjoin the commission of a crime unless the commission of the crime at the same time involves a public nuisance. This action is brought to prevent the evils which are a part of and attendant upon and follow the fight, incidental and necessarily consequent thereto, which the state claims constitute a public nuisance. If the fight is prevented these will also. These involve the honor and good name, the peace and dignity of the state, the morals, welfare and happiness of her people, and incidentally their property, and the progress of her and their civilization. There is no adequate remedy at law.

The defendants say the matter complained of does not constitute a public nuisance, and if so, that no property rights, or rights proprietary in their nature, or civil rights, or legal rights, are involved, and therefore a court of equity has no jurisdiction.

In the proposed contest two pugilists trained

to the highest degree of physical force and endurance will compete in an animal and brutal way for mastery; each with muscles of iron and nerves of steel will strive as only his kind has striven before to do what may be necessary to break his opponent down. The prize is not only for a title deeply coveted for its value in notoriety, but for its great money value to its possessor. The cash prize to be won is said to be the greatest ever striven for at such a contest. These men will not stay their hands for any humane or sentimental consideration. If held back from doing destruction to each other it will be only because they obey the referee. The referee cannot tell in advance when the final brutal blow will be delivered. The limited round feature of the affair does not determine whether such a blow will be given. Corbett received his quietus in the fourteenth round, and in the seventeenth round one, Majesty, received a blow from which he died. This was in his contest with Seville, who was sent to the penitentiary of Ohio for his participation in the affair.

Reference has already been made to that case. The Supreme Court describes the contest:

"They fought seventeen rounds, and on the eighteenth, Majesty was knocked reeling to the ropes, and carried away in a dazed and unconscious condition, and in a few hours afterward died from the effect of the blows received. The post mortem examination disclosed that his vital organs were in a healthy and sound condition. His skull was fractured by one of the blows, and an artery of the brain ruptured, which caused his death. His head, neck, one arm, and his body, showed the severity of the blows he had received. One eye was blacked, his nose cut, his mouth and lips bruised and swollen, and the physicians say that his neck, arm and body were black and blue from bruises produced from blows. Witnesses described the blows struck him as bitter blows; and yet up to the last round they say Seville's punishment was even greater than that administered to Majesty. When Majesty was carried, disabled and dying, from the scene of the conflict, the prize money was paid over to Seville, who departed by the first train."

Twenty thousand people will be in attendance —not a self-respecting woman among them, and no boys or girls. Young men of means sowing their wild oats, and professional and business men of sporting proclivities will be there. Every sport in the United States who can raise the money will be present. The testimony shows this and the court takes judicial notice of the fact. Gamblers, confidence men, bunko steerers and pool sellers will fill the vast amphitheater about the arena. Betting will be rife. The occupations of these last described persons are criminal under the statutes everywhere, and these men are, for a large part,

criminal by nature. Deadly weapons will be found in many pockets. Such an assembly for an undoubtedly unlawful purpose is riot. These men are of the idle and vicious elements in society, whose lives and conduct degrade a community. To repress them, criminal laws are enacted. In their train come the harlots. Many of these kinds of people will remain after the conflict is over, some because they have not means to leave, others because this city will have become a safer harbor for them, will be "wide open," and give further continued opportunity for their several occupations for a long time to come.

Indeed, if this affair comes off, its promoters expect to continue and give similar entertainments, and the city will become a Mecca for all the sporting fraternity of the country, and would be adopted as their home. Their presence would necessitate additional public expenditures for police and the maintenance of more courts of criminal jurisdiction. The affair is an invitation to our city to those whom we are constantly striving to keep away. Their presence directly affects the pockets of every taxpayer. But, more than that, the affair will be demoralizing and pernicious in its effect on the good order and well-being of society.

Such an assemblage is an offense to every good citizen, and the presence of such numbers of such people, and for such a purpose, interferes with the pursuit of happiness to which he is entitled under the constitution of the United States and the bill of rights of the constitution of Ohio.

The Declaration of Independence holds these truths to be self-evidence, "that all men are created equal, that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. That so secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed. That whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to institute new government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness."

The constitution of Ohio, Sec. 1, Art. 1, of the Bill of Rights, declares that—"All men are by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and seeking and obtaining happiness and safety".

The presence of these kinds of persons in our community makes necessary further effort in the protection of our property, individual and public, and prevents the calm enjoyment of

life and the peaceful pursuit of happiness which is the inalienable birthright of every citizen. Such an assemblage, with all that it means, is a common public nuisance.

In Hill v. Pierson, 45 Neb., 503, 63 N. W., 835, a gambling house is held to be a public nuisance.

In Cranford v. Tyrrell, 128 N. Y., 341, 344, 28 N. E., 514; in Blagden v. Smith, 56 Pac. (Oregon), 292; and in Weakly v. Page, 102 Tenn., 178, 191, 201, 53 S. W., 551, bawdy houses are held to be public nuisances.

And in Hamilton v. Whitridge, 11 Md., 128, even the opening of such a place was held to be a public nuisance.

In 9 Ency. Laws of Eng., at page 228, it is said:

"Acts therefore which seriously interfere with (a) the health, or (b) the convenience of the public generally, or (c) which tend to degrade public morals, have always been considered nuisances for the suppression of which the courts would interfere. Such nuisances may be dealt with whenever they become objectionable for 'none can prescribe to make a common nuisance, for it cannot have a lawful beginning by license or otherwise, being an offense at common law.' "

In 4 Blackstone, 168, it is said: "All disorderly inns or alehouses, bawdy houses, gaming houses, stage plays unlicensed, booths and stages for rope dancers, mountebanks and the like, are public nuisances."

And in Wood on Nuisances, 3 Ed., gaming houses, section, 45, cockpits, section, 46; any business calling together a disorderly crowd, section 48; a lottery, section 49; a low theater and vicious performance, section 52; public exhibitions that corrupt morals or disturb the peace, section 68; are said to be nuisances. And in section 68 it is said:

"A public exhibition that tends to the corruption of morals, to a disturbance of the peace, or of the general good order and welfare of society, is a public nuisance. Under this head are included all puppet shows, legerdemain, and obscene pictures, and any and all exhibitions the natural tendency of which is to pander to vicious tastes and to draw together the vicious and disorderly members of society."

The language in Seville v. State, 49 O. S., 117, frequently quoted in this case, is in accord with these definitions, and the court entertains no doubt whatever that the proposed affair is a public nuisance of the first magnitude.

But the defendants, while conceding that equity may enjoin a public nuisance, although its commission involves the commission of a crime, contend that it cannot interfere unless a property right—alone, says one counsel—is involved; or legal rights, or civil rights, or rights proprietary in their nature—as another claims—are affected.

Equity even as administered by courts of equity involves much of that which its name ordinarily implies. The jurisdiction of its courts had its foundation in natural justice, and was developed from time to time to meet cases as they arose when the law through its rigid rules worked injustice or afforded no remedy or was inadequate. A court of equity will strive to prevent a wrong and to bring about justice if its jurisdiction will possibly permit to do so.

The facts presented to the court here are of such a nature that it is the duty of the chancellor to find a way to prevent wrong if it is within his power.

The defendants rest their case largely on the language of Chancellor Kent, in Attorney General v. Utica Insurance Co., 2 Johns Ch., 370. That action was brought to restrain unauthorized banking. The writ was refused. Chancellor Kent says, at page 380: "But it is an extremely rare case and may be considered if it ever happened as an anomaly for a court of equity to interfere at all * * * by injunction to put down a public *nuisance* which did not violate the rights of property, but only contravened general policy."

The case makes strongly for the defense, but in the decision it appears that while the chancellor expresed generally these views, yet he said at page 382, that it would be quite extravagant to hold unlawful banking to be a public nuisance or that kind of an annoyance a mischief which a nuisance implies. Again he says, page, 378, speaking of injunction:

"It is the strong arm of the court; and to render its operation benign and useful it must be exercised with great discretion and when necessity requires it. Assuming the charge in the information to be true, it does not appear to me that the banking power in this case produces such imminent and great mischief to the community as to call for this summary remedy."

The state, too, had in that case an adequate remedy at law.

In Attorney General v. Tudor Ice Co., 104 Mass., 239, Judge Gray said: "The jurisdiction of equity is limited to the protection of civil rights, and to cases in which full and adequate relief cannot be had on the common law side of the courts."

That case was very like Attorney General v. Ins. Co., *supra*. There was no public nuisance, and there was no adequate remedy at law.

State v. Patterson, 37, S. W., 478, 14 Texas Civil Appeals, 465, is cited, an action to enjoin because it was of opinion that keeping a gambling house was not such a public nuisance as invaded property or civil rights of the pub-

lic at large, but the court say also at page 497, first column: "Though a court of equity has the power to interfere in all cases of nuisance, yet circumstances may exist in one case which do not exist in another to induce a court to interfere or refuse its interference by injunction."

And the court says further that equity will not in all cases interfere by way of injunction to a abate nuisance. "But its powers to do so in such cases belong to the general powers possessed by courts of equity to prevent irreparable mischief and obviate danger for which no adequate remedy exists in law."

And this case is squarely against the claim that property rights must be involved before equity will interfere, for, says the court, page 479, first column: "It is well settled that a common gaming house is, at common law, a public nuisance, and the keeper thereof punishable criminally, *for the reason that persons attracted to it, especially youths, are there lured to vice.*" (Italics the court's.)

State v .O'Leary, 58 N. E., 703, Supreme Court of Indiana, November 27, 1900, presented a case of public nuisance arising from the maintenance of a public gambling house. Rowdies, gamblers and roughs from Chicago and elsewhere frequented the place, and the police seemed powerless to abate it. The injunction was refused, and much in the case seems applicable to the case at bar, but the cases may be easily distinguished. The house was not in a populous neighborhood, but in an open prairie, the nearest house being a quarter of a mile away. No private persons had made complaint of an injury sustained or liable to be sustained; and the matter being of long standing, could have been presented to the grand jury at any time. Under these circumstances the court say, at page 705: "We can see no legal reason why resort should not be had to criminal proceedings to punish and suppress acts, every one of which is expressly forbidden by the code as a crime or a misdemeanor, instead of casting the burden of the abatement of these unlawful practices upon the civil side of the court."

They say also: "The circumstance that the acts constituting the nuisance are crimes or misdemeanors and punishable as such, is not of itself a sufficient reason for refusing the writ."

The court cites many cases to this point, including Columbian Athletic Club v. State, 143 Ind. 98, 40 N. E., 914, 28 L. R.A., 727, to which further reference will be made. And the court say further at page 706, second column:

"The important inquiry in each case is whether under the circumstances of the particular instance, there is a necessity for the exercise of that jurisdiction. The evidence in the case before us entirely fails to establish the existence of such a necessity at this time. We do not undertake to lay down any rule, or to decide that a place where gambling is carried on, and where lawless and disreputable persons congregate for the purpose of gaming, may not, under special circumstances, constitute a public nuisance, and be a proper subject for the exercise of the powers of a court of equity."

Cope v. Fair Association, 99 Ill., 488, lacks the force its language would seem to give it, because the court cites no well considered authorities except High on Injunction. This contains the general statement in favor of defendants' contention.

The question was whether injunction would lie at the suit of a stockholder in an incorporated fair association restraining the company and its officers from permitting for a pecuniary reward gamblers to congregate and, ply their vocation upon the grounds of the company during its annual exhibition, when it did not appear from the bill or otherwise that the complainant or the company had sustained some pecuniary injury or loss. The court decided in the negative, saying: "It is not part of the mission of equity to administer the criminal laws of the state or to enforce the principles of religion and morality, except so far as it may be incident to the enforcement of property rights, *and perhaps other matters of equitable cognizance.* (Italics this court's.)

This is not a well considered case, and the very exception it makes is claimed by the state to include such a case as that at bar. The action was not to protect the interest of the public as a community, and the court was undoubtedly wrong in limiting the jurisdiction of equity in injunction to the consideration of property rights alone.

The defendants cite Attorney General v. Fair Ground Association, 28 Chicago Legal News, in which in an opinion of deep learning, Judge Gibbons of the circuit court, declined to restrain a common nuisance of betting and maintaining horse racing at a race track owned by the defendant. The decision is based on the ground that there were adequate gambling statutes to meet the case, and especially on the ground that the state had no property rights involved, and could not as the father of its people interfere to protect their morality. This court is of opinion that the learned judge takes issue with Mr. Justice Brewer in the Debs case, and with Mr. Justice Harlan in Mugler v. Kansas, to which reference will be made, but it cannot be doubted that the language used is strongly in favor of the defendants.

The language of High on Injunctions, sections 20, 21, 23, tends to establish the contention of the defendants.

In People v. Gas Co., 141 N. Y., 232, 36 N. E., 194, the court refused to enjoin the defendant from obstructing certain streets in Brook-

lyn. One reason is not difficult to find. The court say at page 238:

"In the case at bar the people have abundant remedy without coming into a court of equity."

Attorney General v. Scheffield Gas Co., 3 De G. M. & G., 304, was in effect an action by one gas company against another to prevent the laying of gas pipe in the streets. Lord Justice Turner in that case says squarely, at star page 320: "It is on the ground of injury to property that the jurisdiction of this court must rest, and taking it to rest upon that ground, the only distinction which seems to me to exist between cases of public nuisance and private nuisance is this: that in cases of private nuisance the injury is to individual property, and in cases of public nuisance the injury is to the property of mankind."

But Lord Chancellor Cranworth in his opinion in the same case, the injunction being denied, compared the work to be done in the streets, a small portion being done at one time at any one part of the city, to a person going about the streets with a barrel organ, and at page 336 he says:

"No doubt it would be a very serious nuisance if a person with a barrel organ or bag-pipes were to station himself under one's window all day. That would be a nuisance. But when he is going through the city, he will stop ten minutes at one place and ten minutes at another, and so on all day. If one sort of nuisance could be restrained, I do not see why the other could not. There is a distinction, no doubt. The one interferes with the soil; the other does not involve any interference with the soil. *I do not see in point of principle that this distinction makes any great difference.*"

So the chancellor did not agree with his learned brother that property rights alone gave jurisdiction to a court of equity to enjoin a nuisance.

Parts of the citation from Kerr on Injunction, page 166, are argumentatively in defendant's favor, but the statement by Kindersley, vice-chancellor, there quoted, that noxious smells constitute a public nuisance, is much against them, as will be hereinafter shown.

In Spelling on Extraordinary Relief, section 24, it is said that: "Equity has no jurisdiction to interpose for the prevention of crime, or to enforce moral obligations, nor will it interfere for the prevention of illegal acts merely because they are illegal."

In such cases he says there is a fundamental want of jurisdiction, but he damages the strength of the statement by saying that equity's aid will not extend to restrain the violation of public or penal statutes in the absence of any injury to property rights; because it is unquestionably true, and indeed conceded, that indictable smells, obstructions to highways, and pollutions of streams may be enjoined as public nuisances.

In Saltau v. De Held, 2 Simon, N. S., 133, the vice-chancellor says, at page 151: "Now it is true that equity will not interfere, in case of nuisance, where the thing complained of is a nuisance at law. There is no such thing as an equitable nuisance."

It is true that section 6921, defining a nuisance, does not include such a nuisance as the state complains of, but section 6893 defines a riot as follows: "When three or more persons assemble together to do an unlawful act with force and violence, * * * and make any preparation or movement therefor, * * * they are guilty of riot," and shall be fined or imprisoned. Such an assemblage as the proposed would be a riot, and comes under the common law definition of a nuisance.

There is much in the language of the court in State v. Uhrig, 14 Mo. App., 413, in defendants' favor. It was held that equity would not restrain the keeping of an unlicensed dram shop, although it was a public nuisance. Apparently there was but one offense. It does not appear there was no adequate remedy at law, and the court was of opinion that the accused was entitled to a trial by jury, a theory exploded in the Debs case and many others, and in fact, in all cases in which the chancellor was dealing with public nuisances which also involved crimes.

Railroad v. Pruden, 20 N. J. Eq., 530; Canal Co. v. Fagin, 22 N. J. Eq., 430; Attorney General v. Glouster, 24 N. J. Eq., 89, do not present considerations entitling them to particular discussion at this time.

Raritan Tp. v. Railroad, 49 N. J. Eq., 11 Syl. 5, 23 A., 127, to which the court was cited, is in point for the state.

The claim that equity will not interfere until it is established with certainty what the nuisance will be, 14 Enc. of P. & P., 1228, may be conceded. Also that the acts complained of will necessarily result in a nuisance. Wood on Nuisance, 796.

Adame v. Michael, 38 Md., 125; Bowen v. Mauzy, 117 Ind., 258, 19 N. E., 526; Thebaut v. Canova, 11 Fa., 143; Ross v. Butler, 19 N. J. Eu., 294; McCord v. Iker, 12 Ohio, 387; Goodall v. Crofton, 33 Ohio St., 271, 275; Remington v. Foster, 42 Wis., 608; Emperor of Austria v. Day, 3 Deg. F. & J., 217, 240, 241, are in line with the other cases cited by defendants.

In World's Columbian Exposition Co. v. U. S., 6 C. C. A., 58, 56 F., 654, no showing of irreparable injury was made nor inadequacy of remedy at law. If there is any conclusion in Fisher v. Amusement Co., 4 N. P., 329, contrary to the conclusion reached in this case, this court declines to be governed thereby.

The claim that other remedies for nuisance are provided by statute, and when so created

are exclusive, may be answered by saying that the other remedies belong to the criminal procedure, and this action is to be sustained, if at all, because those remedies are inadequate. It may be true, as claimed, that ordinarily the attorney general cannot interfere when the city has the power to suppress a nuisance. On this the court does not express an opinion. But this power is legal power which is inadequate in this instance because he who should exercise it is in league with evil-doers whose threatened nuisance is sought to be enjoined.

The proposed contest is pernicious to the young in that among other reasons it sets a false standard of manly virtues. It is a disgrace to the community, and affects the fair name and honor of the state and of the city and of their citizens. It makes a man's city a less desirable place to live in. It subjects him and his family to frequent contact in the street with improper characters in large numbers, and is humiliating to him as a citizen. It is a distinct step backward. The progress from barbarism to civilization is as slow as the grinding of the mills of God. Each generation sees but little of the advance of those things which are lofty and pure, and uplifting, and can only find hope for the future by comparison of the conditions which now are with those which have gone before. Society and mankind are constantly struggling against the evil tendencies inherent in their nature, and as success in the effort comes, the community or man gradually becomes better, partaking of that highest quality which belongs to the plane of civilization mankind is destined to reach.

There is no such thing as preserving a moral status. A man advances or he retrogrades; he gets better or he gets worse; and so it is with the community. There is no such thing as standstill. By constant effort to overcome evil, evil is more easily overcome, and a high character in man is the outgrowth of a vigilant struggle against those tendencies which draw him down. It is so with the community. Such things as this affair retard our forward progress toward the better, and make us worse. They are degrading, and being so they are injurious to the moral tone of the community, and tend to make it and private standards lower.

These are direct denials of the pursuit of happiness and the enjoyment of life guaranteed to a man by the fundamental law of the land. These rights may not be proper rights, or legal rights in a strict sense, but they are civil rights, and if they are, any public nuisance which interferes with them may be enjoined in equity.

But no property right is necessarily involved when the health of the public is injured by a polluted stream, or when their sensibilities are offended by a bad smell, or when their convenience is interfered with by obstructions in a highway. If these, if amounting under the circumstances of the particular case to be public nuisances, can be enjoined, is there any reason why a public nuisance which injures the name and reputation of the place a man lives in, is corrupting to the young, is a disgrace to his community and a humiliation to him, breaks into and interferes with his pursuit of happiness in all ways, prevents his enjoyment of life and is degrading to the morals of the community, should be permitted without remedy in equity when the law is powerless to prevent?

Just what may be included in the phrase "pursuit of happiness" has not been defined. The Supreme Court of the United States have carefully refrained from defining "due process of law," as used in the constitution, but have decided whether or not each particular case as it came up was within the meaning of the phrase. Equity will not enjoin a crime or an act merely immoral, but when the crime is a public nuisance, such as a polluted stream or a bad smell, or an obstructed highway, it will do so. Why on principle should it not when the immoral act is a public nuisance, shocking to one's moral sensibilities; and why, if a man's happiness and comfort is injured by a bad smell, if the principles of equity jurisprudence will give him relief, should not the same principles protect his happiness and comfort when are involved disastrous moral consequences to his state and city, himself, his family, and the community in which he lives?

Surely the offense to his nose is not of more importance than a moral stench which may make his life miserable. There is no difference in principle, and the state is interested in behalf of all its inhabitants in these things. To secure happiness, their comfort, their morality, among other things, individuals have established the state, its constitution and its courts. Without attempting to say what may be included in the phrase "pursuit of happiness," the court is of opinion that the threatened acts complained of in this case, would, if accomplished, be a clear infringement of the rights guaranteed by that clause of the constitution.

It is said that there are no precedents: This is a mistake as will be shown. And that the court will not make a precedent; this is true if it means that the court will not invent a new remedy. But if making a new precedent means applying old and well established principles to a new state of facts, then this court will not hesitate to make one, for this is what courts of equity have been doing from the beginning.

"Courts are not to assume jurisdiction, but they may amplify remedies and apply rules and general principles for the advancement of substantial justice." Hamilton v. Whitridge. 11 Md., 128.

It was said in Toledo, A. A. & N. M. Railroad Co. v. Pennsylvania Co., 54 Fed. Rep., 746, 751, 19 L. R. A., 395, that:

"Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time without a precedent    If based on sound principles, and beneficient results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief    Mr. Justice Brewer, sitting in the circuit court of Nebraska, said: 'I believe most thoroughly that the powers of a court of equity are as vast, and its processes and procedure as elastic, as all the changing emergencies of increasing complex business relations, and the protection of rights, can demand.' "

With such views as these Mr. Justice Brewer delivered the opinion of the court in the Debs case afterwards in the Supreme Court of the United States.

Says the Supreme Court of Indiana, in Columb'an Athletic Club v. State, 143 Ind., 98 (see 40 N. E., 914; 28 L. R. A.,727), at page 102:

"Extraordinary emergencies in many cases call for extraordinary remedies."

The learned judge who decided the case quotes from Lord Chancellor Cottenham: "That it is the duty of courts of equity (and the same is true of all courts and of all institutions) to adapt 'its practice and course of proceedings, as far as possible, to the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and not from too strict an adherence to forms and rules established under very different circumstances, decline to administer justice, and to enforce rights for which there is no other remedy."

And in that case the court proceeded to enjoin an athletic club which was conducting prize fights on the ground that the club was maintaining a public nuisance.    To which case further reference will be made.

But the court is not driven to the necessity of making a precedent, as will hereafter appear.    That the state through its attorney general can maintain an action in equity to enjoin a public nuisance is well settled.    State v. Railroad, 36 Ohio St., 434, 439; Story Eq. Jur., Secs. 921 to 924; 3 Pomeroy Eq. Jur., Sec. 1349: Atty. Gen. v. Hunter, 1 Dev. Eq., 12; State v. Saunders, 66 N. H., 39 at 81 et seq. 25 A., 588, 18 L. R. A., 646; Dist .Atty. v. Railroad, 16 Gray, 242, at 245; Atty. Gen. v. Blount, 4 Hawk (N. C.), 384; Atty. Gen. v. Charles, 11 Weewly Rep. (Eng.), 253; Atty.

Gen. v. Heatley, (1897) 1 Ch., 560; Mugler v. Kan., 123 U. S., 672, at 673; United States v. Debs, 64 Fed. Rep., 724, at 740, et seq., Debs, In re, 158 U. S., 564; Atty. Gen. v. Jamacia Pond, 133 Mass., 361, 363.

"That courts of equity exercise jurisdiction in cases of purpresture and nuisance, of encroachments upon the public rights, as upon highways, rivers and streets of towns, is well settled.    The jurisdiction is predicated upon the broad ground of preventing irreparable injury, interminable litigation, a multiplicity of suits and the *protection of rights.*"    Judge White in State v. Railroad, 36 Ohio St., 434, 439.    (Italics this court's.)

In Attorney General v. Hunter, 1 Dev. Ep., 12, the health and comfort of a great many people were effected by noxoious and noisome exhalations from the backwater in a dam. This was enjoined on the ground that the public health and comfort were injured by it.

The Supreme Court of New Hampshire in State v. Saunders, 66 N. H., 39 (25 A., 588; 18 L. R. A.,646), at page 74, say:    "The incidental right to an adequate remedy for the infringement of a right derived from the unwritten law is coeval with the right of which it is an incident."

How much more is this true when the right is embodied in the language of the Constitution itself.    In Story's Eq. Jur. Secs. 921, 923, it is said:

"In regard to public nuisances, the jurisdiction of the courts of equity seems to be of very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth.    The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. * * * In cases of public nuisances, properly so called, an indictment lies in eqnity to redress the grievances by way of injunction."

And the attorney general may bring the action—"either *ex officio,* or upon the relation of persons who have an interest in the subject matter of the bill, and whose private rights may be protected by the decree which is sought mainly on the ground of a public injury.'    District Attorney v. Railroad, 16 Gray, 242, 245.

In Attorney General v. Charles, 11 Weekly Rep. (Eng.), 253, noxoious smells from a factory were so offensive as to cause headache, sickness, and other bad effects.    A preliminary order of injunction issued.

In Attorney General v. Hartly, 1 Ch., 560 (1897), it appeared that the owner of a vacant lot permitted rubbish and filth to be thrown upon it, and he was enjoined because he was maintaining a common nuisance.    A common nuisance is there defined to be, at page 566: "An offense against the public, either by doing a thing which tends to the annoyance of

·the king's subjects, or by neglecting to do a thing which the common good requires."

This definition, which meets the case at bar exactly, is by Lord Justice Lindley of the Court of Appeal of England.

Story's statement of the power of equity to enjoin a public nuisance is quoted in Mugler v. Kansas, 123 U. S., 623, at page 672, with approval; and mark the language of Mr. Justice Harlan, at page 673:

"The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy, than can be had at law. They cannot only prevent ·nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and by perpetual injunction, protect the public against them in the future whereas courts of law can only reach existing· nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a ·salutary jurisdiction, *especially where a nuisance affects the health, morals, or safety of the community... Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury.*" (Italics this court's.)

This case is vigorously attacked on the ground that the manufacture and sale of intoxicating liquors in Kansas was made a public nuisance by statute in that state; but does not affect ˙in the slightest the statement of the court ˙of the power of equity to restrain any public nuisance affecting the morals of the community, whether it is made so by statute or ˙is one *per se.*

In Attorney General v. Jamaica Pond Aqueduct, 133 Mass., 361, Chief Justice Morton says at page 363: "The cases are numerous in which it has been˙ held that the attorney general may maintain an information in˙ equity to restrain a corporation, exercising the right of eminent domain under a power delegated to it by the legislature, from any abuse or perversion of the powers, which may create a public nuisance or injuriously affect or endanger the public interests."

But the Debs case, In re Debs, 158 U. S., 564, is conclusive of the question of law at issue. Debs and others were enjoined from conspiring to forcibly obstruct interstate transportation of persons and property and the˙ carriage of the United States mails. The district attorney of the United States by direction of the attorney general applied to the United States circuit court at Chicago, sitting as a court of equity, to restrain such obstruction and prevent the conspiracy from being carried into effect. Without attempting to set forth at length the conclusions of the court in that case, it is sufficient for our purposes to quote

from the opinion of Mr. Justice Brewer at page 583: "Neither can it be doubted that the government has such an interest in the subject matter as enables it to appear as party plaintiff in this suit. It is said that equity only interferes for the protection of property, and that the government has no property interest. A sufficient reply is that the United States have a property in the mails, the protection of which was one of the purposes of this bill. * * *

And at page 584, the following language is, used, which forever disposes of the claim that equity will not restrain a common nuisance when property rights are involved.

"We do not care to place our decision upon this ground alone. Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself, sufficient to give it a standing in court. This proposition in˙ some of its relations has heretofore received the sanction of this court."

The law has given the power to the attorney general of Ohio to institute actions and appear in the courts of the state by section 202, Revised Statutes. Among other things, it says:

"When required by the governor or general assembly he shall also appear for the state in any court or tribunal in any. cause in which the state is a party, or in which the state is directly interested."

The state is interested in this controversy,. deeply interested, for the well being, the safety, the happiness, the morals, the honor, and for the good name of the community and her citizens.

It being shown conclusively that the proposed affair is injurious to public and private morals, is subversive of common right, affects the welfare, safety, comfort, peace, morals and happiness of her citizens, and the honor and dignity of the state; that for it there is no adequate remedy at law; that the mischief to flow from it is irreparable, this court on principle and on authority has no doubt whatever of its jurisdiction to prevent the threatened wrong. But we are not without· authority directly to the point. The same Messrs. Corbett and Fitzsimmons, and Mr. Brady also, not being able to bring about their affair in Texas by reason of the vigilance of the governor in calling the legislature in special session to pass. an act which would cover the case, went to·

Arkansas and there sought to give a boxing contest.

The case was exactly like the case at bar, even to the point that the local authorities were in collusion with the pugilists. It only differed in that the case was heard upon demurrer which admitted the facts, and one of the allegations was that the men were intensely hostile to each other personally. Otherwise the cases are almost identical, although it does not appear that prominent citizens were also made defendants in that case. No good purpose would be served by quoting at length from the decision, although it richly deserves it, but the court adopts the conclusions of the learned Chancellor Martin of Pulaski county, Arkansas, as containing the law of this case also, including the question of the power of the chancellor. It may be permitted, however, to read an extract from his decision, 35 Am. Law Reg., N. S., 104. The learned chancellor says:

"The most efficient, humane and flexible remedy is that of injunction. Under this form the court can prevent that from being done which done would cause a nuisance; it can command an observance of peace before it is broken; it can save suffering and sometimes disgrace to those who are in no way responsible; in some instances, and I believe this case presents one of them; it can secure an obedience to the laws of the country that a court of law, pursuing the other remedy, could not do."

In State v. Olympia Club, 46 La. Ann., 935; 15 So., 190, 24 L. R. A., 452, the Supreme Court of Louisiana while of opinion that the charter of the club should be forfeited because of the character of the contests held by it, yet decided that they were "violative of good morals and of a sound public policy" and Chief Justice Nicholls was "of the opinion that the contests which have been permitted to take place in the Olympic, fall under the prohibitory terms of the law, and that their further continuance should be checked by injunction." The contest sought to be enjoined was also under the Marquis of Queensbury rules.

The Columbian Athletic Club v. State, 143 Ind., 98, 40 N. E., 914, 28 L. R. A.,727, already referred to, was an action in which an information in the nature of a *quo warranto* was instituted against the club to oust it of its corporate franchises, it being engaged in promoting and carrying on prize fighting, in which an injunction was asked to restrain the further maintenance of prize fights, and there was a prayer for a receiver. The court gave full relief upon the bill. The proceeding was not under any statute authorizing a proceeding to forfeit a corporation's charter, but so far at least as the features of injunction and receivership are concerned, was like any other bill in equity, for an injunction and a receiver. The action was maintained so far as it prayed for an injunction on the ground that the club was maintaining prize fighting and its incidents, which were a public nuisance, and a receiver for the club house was appointed.

Nor is its force in the slightest abated by State v. O'Leary, 58 N. E., 703, (Indiana Sup. Ct.) cited by the defendants, for Columbian Athletic Club v. State, 143 Ind., 98, 40 N. E., 914, 28 L. R. A., 727, is cited in that case as authority for this language at page 705, 1 Col.

"While it is probably true that every indictable nuisance may under particular circumstances be enjoined, it cannot be said that a court of equity is bound in every case to award the extraordinary remedy of injunction upon the naked proof of the existence of such a nuisance. The circumstance that the acts constituting the nuisance are crimes or misdemeanors and punishable as such, is not of itself a sufficient reason for refusing the writ."

And this leaves Columbian Athletic Club v. State, 143 Ind., 98, 40 N. E., 914. 28 L. R. A., 727, as presenting a case in which the circumstances constituting the nuisance were maintaining prize fights and punishable as such, and were of such a character that the court enjoined their continuance.

If a mere decision of another court in another state, directly in point, would ever justify a court in deciding a case upon its authority, the case at bar may safely rest upon that decision of the Supreme court of Indiana.

The court, while entertaining some doubt at the beginning of the case as to its jursdiction, was deeply impressed during the argument with the strength of the state's claim in behalf of its jurisdiction; and upon reflection and further consideration of the authorities, and on principle, believes its jurisdiction cannot be questioned. But in a case not free from doubt, underlying which there was an equitable principle which could be recognized as such, the court would not hesitate in the face of such an emergency as now exists, to resolve the doubt in favor of law and order and decency and the well being of the state and city, and their inhabitants, and the interests of good morals and of private and public righteousness.

Let a perpetual injunction issue as prayed for in the petition.